IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 09–21–GF–CCL-01 |
| Plaintiff, | CV 13-45-GF-CCL |
| vs. | ORDER |
| FELIPE ARRIAGA, | |
| Defendant. | |

Before the Court is Defendant Felipe Arriaga's Motion to Vacate, Set Aside, or Correct Conviction and Sentence Pursuant to 28 U.S.C. § 2255 (Doc. 78), as amended by Supplemental Motion in Support (Doc. 84.)

**Factual Background**

Defendant Felipe Arriaga (aka Juan, Johnny, and Flip) was convicted by a jury trial of one count of "Conspiracy to Distribute 500 Grams or More of a

Mixture or Substance Containing Methamphetamine," in violation of 21 U.S.C. § 846. The government filed a section 851 Information against Defendant Arriaga, charging that he had previously been convicted of a felony drug offense in Yakima County, Washington in 1998. At the time of sentencing, Defendant's Offense Level was 36, his Criminal History Category was II, and his Guideline Range for imprisonment was 210 to 262 months. Pursuant to the penalties imposed under 21 U.S.C. § 851, a mandatory minimum sentence of 240 months applied, yielding a final Guideline Range of 240-262 months imprisonment. The Court sentenced Defendant to 240 months imprisonment.

The Indictment alleged that, from approximately January 2005 to at least May 2005, Defendant Arriaga knowingly conspired to distribute 500 grams of methamphetamine at the Fort Belknap Indian Reservation in Montana. At trial, the government presented evidence that in 2004 Defendant Arriaga met Witness 1 ("W1"), in Spokane, Washington. W1 agreed to deliver drugs for the Defendant. One of Defendant's alleged customers, Witness 2 ("W2"), lived on the Fort Peck Indian Reservation, in Hayes, Montana. W2 allegedly sold the drugs on the

reservation. The government alleged that W1 made between 7 and 11 trips to deliver methamphetamine to W2, delivering 1 to 2 pounds of methamphetamine each trip. The government also alleged that the Defendant had met W2 in person and had talked on the telephone with W2 regarding collection of money for drug deals.

During the trial, W1 testified that he had already pled guilty to distributing methamphetamine and had been sentenced to a term of 144 months imprisonment. (Doc. 66, TR 18:18-22.)[1] The government's substantial assistance motion was then pending before another federal judge. (TR 19:22-25.) W1 identified Defendant Arriaga as being his supplier. (TR 22:5-15.) W1 testified that he had been cellmates with Arriaga's cousin in prison. (TR 21:8-17.) After being released from prison, W1 started selling drugs for the cousin (TR 21:24-25), and later, in December 2003, W1 began working for Arriaga as a driver, distributing drugs for Arriaga in various places around Washington. (TR 22:5-15.) W1

---

[1] All transcript references hereafter refer to the Jury Trial transcript in this case.

testified that the reason Arriaga introduced him to W2 was "to sell [W2] drugs, to kind of distant himself [Arriaga] between their [Arriaga-W2] relationship and kind of have me as the middle guy so he could distance himself away from being the main contact." (TR 22:22-23:2.) Arriaga had W1 deliver methamphetamine to W2 in Montana in 2004. (TR 23:12-18.) W2 was the only Montana customer. (TR 23:19-22.) Arriaga gave W1 $250 to $500 per delivery, "depending on where [he] had to go." (TR 24:22-24.) When delivering drugs to Montana, W1 would collect money from W2 and then return the money to Arriaga. (TR 26:6-11.) W1's last delivery to W2, in April 2005, was two pounds of methamphetamine and some marijuana. (TR 25:12-16.) W1 testified that W2 was supposed to have given him somewhere between $30,000 and $35,000 in cash for Arriaga (as payment for the two pounds of methamphetamine and the marijuana) on his next trip to deliver drugs to W2. (TR 27:10-17.)

W2 testified that between January and May of 2005 he sold methamphetamine on the reservation from his home in Hayes, Montana. (TR 35:21-24.) W2 testified that he met Arriaga at a house in Spokane, Washington, in

late summer or early fall of 2004, and he received 4 ounces of methamphetamine at that time, which he then sold on the Fort Peck Indian Reservation in "[a] couple few weeks." (TR 36:14-37:21; 38:24-39:2.) W2 sold that methamphetamine for somewhere between $7,000 and $9,000. (TR 38:4-6.) After that initial meeting, Arriaga sent W1 to collect money and deliver more methamphetamine to W2, who testified that the amounts of methamphetamine increased with each delivery. (TR 39:16-19.) W2 knew W1 as "Chris." (TR 38:13-15.) Arriaga would telephone W2 occasionally, perhaps once a week, to see how much money was being made. (TR 40:16-41:3; 47:3-8.) W2 testified that W1 made four deliveries to him, with increasing amounts of methamphetamine each trip, and two pounds of methamphetamine delivered on the last trip. (TR 39:7-19.) W2 estimated that he had sold about 5 pounds of methamphetamine for Arriaga on the Fort Peck Indian Reservation. (TR 43:8-10, 14-19.) W2 owed Arriaga $32,000 for the last two-pound delivery of methamphetamine, which occurred sometime in March or April 2005. (TR 39:20-40:4; 40:10-15.) W2 had sold half of it by the time his residence was searched on May 11, 2005. (Doc. 66; TR 41:9-14, 22; 42:1.) Law enforcement seized the remainder of the methamphetamine (approximately one

pound), along with approximately $28,000 in cash that W2 allegedly owed to Arriaga.  (TR 54:2-5, 9-13.)  By the time of Arriaga's trial, W2 had completed 16 months on state parole violations relating to the seizure of methamphetamine.  His federal charge had been dismissed on motion of the government after a federal district court suppressed evidence obtained by a warrantless probation search.  (TR 44:8-10; 47:17-48:2; *see also United States v. W2*, 4:05CR137-SEH, Doc. 25.)  W2 had no agreement with the prosecution to testify against Defendant Arriaga, and he explained that he had given up drug use and gotten "right with God."  (TR 42:20.)  W2 testified that he was present at the trial "on [his] own free will."  (TR 44:13.)

The government presented two law enforcement witnesses and a senior forensic chemist (DEA Laboratory, San Francisco) to testify to the drug conspiracy and the nature of the controlled substances seized from the W2 residence.  The government rested, and then the defense rested.  The Court denied the defense Rule 29 motion, and counsel and Defendant Arriaga met with the undersigned in chambers to settle jury instructions, to which there were no objections.  (TR 74:18-77:15.)  After a brief recess, the Court reconvened with the

jury, but defense counsel requested a sidebar, informing the Court that the

Defendant desired to testify, stating for the record that "my client has had a change

of mind." (TR 77:17-78:11.) Without objection from the government, the Court

granted the motion.

Defendant Arriaga then testified on direct examination that his cousin had

introduced him to W1. Arriaga testified that he did sell drugs "with" W1, but not

between January 2005 and May 2005. (TR 84:23-25.) Arriaga testified that he

did know W2, having met him one time in January 2003, but he did not "do

things" with W2 in the time frame that the government alleged. (TR 80:15-16

"Me and [W1], we would do things but not to that extent...."; TR 81:9-11 "the

dates that they are saying that happened, that--I wasn't--I wasn't involved in that

transaction.") Arriaga testified, "the time frame that the Government is trying to

say that I did things with [W2] is not true. That's what I wanted you guys to hear

from my voice." (TR 82:1-4.) Arriaga testified that he only met W2 one time in

January 2003. (TR 82:9-16.)

On cross-examination, Arriaga testified that it was true that his cousin had

been a cellmate in prison with W1. (TR 88:1-5.) Arriaga admitted that he had

been dealing heroin with W1, but only in Washington state.  Arriaga said that W1 was a big heroin dealer, and Arriaga admitted selling heroin.  Arriaga testified that "Me and [W1], we know each other, we dealt a lot of times together."  (TR 85:15-17.)  Arriaga admitted "I've done a lot of bad stuff in my whole life," but "I wasn't doing it with these individuals."  (TR 85:18-25.)  Specifically, Arriaga asserted that he had never dealt drugs with W2, although Arriaga knew of W2 and who he was.  (TR 86:12-17.)  Arriaga admitted selling heroin for only two or three months.  (TR 87:22-25.)

Arriaga testified that, at the time of trial, he was self-employed and worked with his wife's cousin in a drywall company.  (TR 87:3-7.)

On cross examination, Arriaga admitted having made a telephone call to W2 in 2008 and having left a voicemail on W2's home telephone.  (TR 88:6-12.) Apparently contradicting his earlier testimony that he had only met W2 one time and did not sell him drugs, Arriaga testified that the call was in relation to a period "when I dealt with [W2]..."  (TR 89:1-2.)  The prosecutor asked what he meant by "dealt with [W2]," and Arriaga replied, "Yeah, when I dealt with [W2]."  (TR

89:4-6.) The prosecutor then asked, "When did you deal with [W2]?" and Arriaga

replied, "Back 2003 or around there." (TR 89:4-8.)

Arriaga's testimony regarding his 2008 telephone call to W2 was confusing:

Q.    What was the purpose of that call?
A.    The purpose was that there was stuff going around the reservation
      that one of my friends told me that happened back in 2002, 2003.
Q.    Which friend?
A.    Some friend.
Q.    Do you know who, a name?
A.    Actually, can I bring him in? Like not bring him in, but not affect
      him if I say?
Q.    No, I just wanted a name.
A.    Okay. Antonio.
Q.    This Antonio told you what?
A.    That some stuff was going on on the reservation when I dealt with--
      when I dealt with [W2], you know, that had happened, so I give him a
      call. So I called him.
Q.    What do you mean by when you dealt with [W2]?
A.    Yeah, when I dealt with [W2].
Q.    When did you deal with [W2]?
A.    Back 2003 or around there.
Q.    Okay. And this--so, you dealt with [W2] back in 2003?
A.    Yes.
Q.    And you heard about something --
A.    Because what had happened was that with [W2], the way we met him,
      we met him through Ron Bird. There was another guy that was
      working with Ron Bird and [W2]. Something happened at the
      reservation, I don't know what happened, but that [W2] owed some

money to my friend.  So then I heard about that.  My friend calls me
and he goes, hey, we don't know what happened to [W2].  So, we
called -- I called.  I go, hey, what's going on, [W2], how are you --
you know, how you been, you know, let's -- you know, have you
talked Ron Bird?  Have you talked to Ron Bird?  He's like, well, I
haven't talked to him for a while.  I was like -- you know, I'm like,
well one of these days so we can talk and, you know, and to see what
is going on, you know, what happened with my friend.

(TR 89:13-90:2.)

The jury deliberated one hour and then returned a verdict of guilty.  Using a

Special Verdict Form, the jury found beyond a reasonable doubt that the amount

of methamphetamine that Defendant Arriaga conspired to distribute was 500

grams or more of a mixture or substance containing a detectable amount of

methamphetamine.  (Doc. 51, Verdict at 2.)

**Section 2255 Standard**

A prisoner is entitled to relief under 28 U.S.C. § 2255 "[i]f the court finds

that the judgment was rendered without jurisdiction, or that the sentence imposed

was not authorized by law or otherwise open to collateral attack, or that there has

been such a denial or infringement of the constitutional rights of the prisoner as to

render the judgment vulnerable to collateral attack. . . ."  28 U.S.C. § 2255.

However, it is the prisoner's burden to establish his claims, and the prisoner must

"clear a significantly higher hurdle than would exist on direct appeal."  *United*

*States v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

This motion is subject to preliminary review to determine whether "the

motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief."  28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing

Section 2255 Proceedings for the United States District Courts.  When this

standard is met, a hearing is not necessary.  *Marrow v. United States*, 772 F.2d

525, 526 (9th Cir. 1985).  Moreover, section 2255 relief provides an extraordinary

remedy, *see United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 60

L.Ed.2d 805 (1979), and it is the petitioner's duty to prove entitlement to it by a

preponderance of the evidence, *see Farrow v. United States*, 580 F.2d 1339, 1355

(9th Cir. 1978).

**Discussion**

Defendant's first two claims are for ineffective assistance of counsel.  The

Court applies the familiar standard supplied by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (creating two-part test for ineffective assistance of counsel claims). First, Defendant Arriaga must show that his attorney's performance was deficient. This requires that he show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." This is a heavy burden. *Strickland*, 466 U.S. at 689. Second, Arriaga must show that the defective performance prejudiced the defense to such a degree that the results of the trial cannot be trusted. *Id.* "A reasonable probability [that the results would be different] is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Counsel's performance is viewed from the perspective of defense counsel at the time of the alleged error and in the context of all the circumstances. *Id.* at 690. The Court must indulge defense counsel "with a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the [movant] must overcome the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." *Id.* at 689.

Generally, other than objecting to introduction of the drugs and cash at his trial, Defendant now claims that "[e]ssentially, Arriaga went on the stand and plead guilty." (Doc. 84 at 3, emphasis in original.) Defendant claims that "it is obvious that Arriaga was not aware that the government had the right to ask him if he was associated with Mr. [W1] and Mr. [W2], or that his own counsel would ask if he was associated with W1 or W2, nor that testifying, he had to answer all questions." (Doc. 84 at 3-4.) Defendant claims that "there was no discussion about him having a right to testify or remain silent, not [sic] about the government's power in cross-examination." (Doc. 84 at 4.) Arriaga states that (at the point of closing arguments in the trial) he "simply told counsel that he wanted to tell his side of the story, and counsel said okay." (Doc. 84 at 4.) Defendant asks, "[w]hy would counsel allow his client to confess to a crime right in front of the jury?" (Doc. 84 at 4-5.) Defendant cites *Brecht v. Abrahamson*, 113 S.Ct. 1710 (1993), for the proposition that all these errors resulted in a substantial influence on the jury's verdict, resulting in a violation of Defendant's right to due

process and effective representation.

**Claim 1. Failure to object to the introduction of evidence at trial that was seized unlawfully from W2.**

Defendant asserts that his counsel, Mr. Ashley, failed to object to the introduction of "unlawfully seized evidence [which] came from W2's house on the Fort Belknap Indian Reservation." (Doc. 79 at 2-3.) Defendant alleges that drugs and money were seized from W2's evidence in violation of the Fourth Amendment.

It was not an error for defense counsel to fail to file a suppression motion or to fail to object to the introduction of evidence (one pound of methamphetamine and $28,000 cash) illegally seized from the residence of W2. On the facts of this case, Defendant Arriaga cannot establish standing to assert a Fourth Amendment violation, which is his burden. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). To meet his burden, Arriaga would be required to show that he had a protected property interest or a reasonable expectation of privacy, either actual or subjective, that was infringed upon by the search of W2's

residence on the Fort Peck Indian Reservation. *See United States v. Padilla*, 111 F.3d 685, 688 (9th Cir. 1997). There is no evidence that Defendant Arriaga had ever visited the W2 residence or had any ownership interest in W2's residence or any reasonable expectation of privacy in it.

Thus, failure to file a futile motion to suppress is insufficient to demonstrate ineffective assistance of counsel. *James v. Borg*. 24 F.3d 20, 27 (9th Cir. 1994). Defendant cannot meet the *Strickland* test because this claim fails on its merits. *See Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."). Claim 1 is without merit.

**Claim 2. Defense counsel failed to effectively advise Defendant Arriaga of his right not to testify and the risks associated with testifying.**

Defendant's second ground for relief is the claim of ineffective assistance of counsel based on Mr. Ashley's alleged failure to "effectively advise Arriaga on his right to testify, and on the consequences associated with testifying...." (Doc. 84 at 2.)

The Defendant did not call any witnesses during his case in chief. After the defense rested, the undersigned district judge met in chambers with Defendant Arriaga and counsel for both sides to settle jury instructions. Defendant Arriaga said nothing during the settling of jury instructions. Neither counsel made any objection to the jury instructions. (TR 74:18-77:15.) A brief recess was then taken. (TR 77:19.) During the recess, Defendant Arriaga apparently informed his defense counsel, Mr. Ashley, that he wished to testify. Upon returning to the courtroom, Mr. Ashley moved to re-open the defense case, explaining that "my client has had a change of mind" and now Defendant wished to testify. (TR 78:5-11.) There being no objection from the government, I granted the motion to re-open the defense case and allowed Defendant Arriaga to testify. (TR 78:1-25.)

In *United States v. Martinez*, 883 F.2d 750 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991), defense counsel's failure to tell the defendant that he had a right to testify despite defense counsel's recommendation was insufficient to demonstrate ineffective assistance of counsel because the record showed that the

defendant did know that he had a right to testify. *Id.* at 757. In this case, the fact that Defendant thought he had the right to "change his mind" indicates that Defendant knew that he had a right not to testify, but he voluntarily decided to waive that right. "[T]he ultimate decision whether to testify rests with the defendant." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) (citation omitted).

It was apparent that Mr. Ashley had not planned to call Defendant Arriaga as a witness. Mr. Ashley made no mention of any testimony from Arriaga in his opening statement, and the defense rested immediately after the Court denied Defendant's Rule 29 motion. (TR 72:21-73:4.) The Court assumes that in the normal course of representation, defense counsel would explain to a defendant the benefits and risks of testifying, particularly in a drug conspiracy case when the defendant has a prior drug conviction. From all the record, it appears that the decision of defense counsel and Defendant prior to trial was that Defendant would not testify, and Defendant does not claim otherwise.

When a defendant appears at trial with counsel, the court infers that the

defendant has knowingly and intelligently waived his right to represent himself. *Martinez*, 883 F.2d at 757. Similarly, when a defendant takes the witness stand, the court infers that the defendant has knowingly and intelligently waived his right not to testify. *Id.* "It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical advantages and disadvantages of each choice." *Id.* The court therefore may infer knowing and intelligent waiver from the defendant's conduct. *Id.*

Importantly, Defendant's claim is not that his counsel *never* explained the risks of taking the witness stand. There is no allegation in this case that counsel did not have a *pre-trial* discussion with the Defendant as to whether he should or should not testify. The claim is that just prior to closing argument, when Defendant "changed his mind," counsel did not *stop* him from testifying by strenuously arguing against it. However, the pretrial discussions between Defendant and counsel should also be taken into consideration in deciding whether Defendant knowingly and intentionally relinquished his right not to testify.

Defendant's additional allegation that defense counsel failed to tell him, and he did not know, that he would be cross-examined by the government is another bald allegation not supported by the record. Defendant observed the cross-examination of five witness before him and also heard the Court explain to the jury that all the witnesses in the trial would be cross-examined. (TR 12:13-17.)

Thus, Defendant's claim of deficient performance by counsel consists of bare allegations unsupported by the record. "[T]he advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'" *Carter v. Lee*, 283 F.3d 240, 259 (4th Cir. 2002) (citation omitted). Under these circumstances, counsel's decision to allow Defendant to testify deserves the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and the presumption that counsel's decision to allow Defendant to testify "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citation omitted). Defendant's testimony was clearly a last ditch attempt to prevent conviction, and defense counsel ultimately

supported Defendant's right to make that attempt as a matter of strategy and tactics.

Defendant Arriaga claims prejudice by asserting that if he had been properly warned against testifying, he would not have testified and might not have been convicted. This bare allegation is insufficient to demonstrate prejudice. The government's case against Defendant was solid. The government presented testimony from two individuals, a drug mule and a drug dealer, who were barely acquainted with each other and who lived in different states. They were credible witnesses. Both had met the Defendant in person and believed him to be their drug supplier. W1, the drug mule, was a Washington resident. W2, the drug dealer, was a Montana resident. Both individuals testified that the supplier of their drugs was Defendant Arriaga. Both individuals testified that they participated in multiple transactions with each other, and that W1 obtained the drugs from Arriaga and returned W2's cash to Arriaga. W2 testified that Arriaga telephoned him periodically to inquire about the progress of sales and cash collections. While W1 had an incentive to testify against the Defendant, W2 had no such incentive.

Yet their testimonies corroborated each other on all essentials. This record does not support Defendant's claim that there is a reasonable probability that the verdict would have been different had he not taken the stand. Defendant's claim of prejudice is negated by the government's strong case against Defendant. Claim 2 is without merit.

**Claim 3. The Court failed to advise Defendant of his right not to testify.**

Although Defendant failed to present this claim on direct appeal and has not shown good cause for the procedural default, *see United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Court will address it on the merits. *See Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517, 1523, 137 L.Ed.2d 771 (1997). Defendant's third claim is that the Court "failed to ascertain through voir dire and/or basic questions to Arriaga, as to whether he was aware of his Constitutional rights to testify, not to testify, and whether Mr. Arriaga was aware of the consequences of testifying." (Doc. 84 at 2.)

However, the Court explained at the beginning of trial that the Defendant had no burden to testify:

The Defendant has no burden to prove his innocence or to present any evidence *or to testify*. Now, since the Defendant has the right to remain silent, the law prohibits you in arriving at your verdict [from] considering the fact that the Defendant may not have testified, if he does not, and inferring guilt and holding that against him. You cannot do that."

(TR 8:21-9:3 (emphasis added).) Thus, the Court informed both the Defendant and the jury that he was not required to testify and that the jury was not permitted to hold that fact against him in arriving at its verdict.

A trial court has no duty to give personal advice to a defendant as to his right to testify. *See, e.g., United States v. Martinez*, 883 F.2d 750, 756-60 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991). Indeed, such advice could inappropriately influence the defendant to waive his right to testify or not testify by appearing to communicate the court's opinion on the matter. *Id.* at 757. Claim 3 is without merit.

## Conclusion

Thus, having considered the Defendant's Motion, the Court's file, and all the record of this case, the Court has determined that the Defendant is not entitled to relief as to his section 2255 Motion to Vacate Sentence. Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion Pursuant to 28 U.S.C.

§ 2255 (Doc. 78) is DENIED.

A district court must issue a certificate of appealability when jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000). Finding that Defendant Arriaga has failed to make a substantial showing of the denial of a constitutional right and that no jurist of reason would debate the correctness of denying Defendant collateral relief,

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

The Clerk is directed forthwith to notify Defendant Arriaga of the entry of this order.

Done and Dated this 16th day of March, 2015.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE